UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALISA M. LEVIN AND LEVIN LAW, LTD.,
      *Plaintiffs*,

v.

PAUL ABRAMSON,
      *Defendant,*

Case No.

**1st AMENDED COMPLAINT**

*NOW COME* the Plaintiffs Alisa M. Levin ("Levin") and the law firm Levin Law Ltd. (the "Firm") an individual and entity who are citizens of the State of Illinois, and as and for their 1st Am. Complaint against the Defendant Paul Abramson ("Paul"), a citizen of the State of California, the Plaintiffs state as follows:

**NATURE OF THE ACTION**

1. This is a defamation and false-light action brought by Plaintiffs Levin and the Firm (an attorney and her Chicago-based law firm), against Paul Abramson ("Paul"), a former client of the Firm and a resident of the State of California, alleging Illinois state-law claims.

**PARTIES, JURISDICTION AND VENUE**

2. Alisa Levin is and resident of the City of Chicago, and a citizen of the State of Illinois

3. Levin Law, Ltd. is an Illinois corporation duly formed and in good standing, having its principal place of business in Chicago Illinois.

4. Paul Abramson is a resident and citizen of the State of California, residing (on information and belief at) 676 Caruso Avenue, Glendale CA 91210.

1

5.      As the parties are completely diverse, the Court has subject-matter jurisdiction pursuant to 28 U.S.C. §1332. The Court has supplemental jurisdiction of Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

6.      Diversity is established insofar as Plaintiffs are residents and citizens of the State of Illinois and Defendant is a resident and citizen of the State of California.

7.      The amount in controversy is One Million One Hundred Thousand ($1,100,000.00).

8.      Venue is proper under 29 U.S.C. ¶139(b)(2) because a substantial part of the conduct giving rise to the claims was in this judicial district.

## GENERAL ALLEGATIONS

9.      Levin is an attorney licensed in the State of Illinois, and she is employed by and the sole-owner of Levin Law, Ltd (the "Firm").

10.     Levin has been continuously practicing law since admission in Illinois.

11.     Levin and the Firm's practice areas include commercial litigation and appellate work (but are not limited to those areas).

12.     For all matters involving litigation, Levin and the Firm employ the use of a written retainer agreement which is fully explained to any prospective client as to the nature of legal fees and hourly charges, and the retainer agreement outlines the hourly rates that the firm will charge for all services rendered (and which such agreement outlines the necessary initial retainer fee that the Firm requires - after review of the matter by way of a consultation - to begin any work on the client's behalf).

13.     The written retainer agreement, unless otherwise specified in writing, is not a "flat-fee agreement" and in such cases where Levin or the Firm do flat-fee work, there is a wholly separate document used by the Firm to outline those arrangements where appropriate.

14. It is the Firm's practice when a prospective client makes any contact with the firm in writing or over the phone or in person, depending on when an initial consultation takes place, to quote an "initial retainer fee" and to explain that necessary fees and costs are deducted from the retainer if needed, and that the hourly legal fees are billed against the retainer in increments of $1/10^{th}$ of an hour.

15. Levin, on behalf of the firm, likewise quotes hourly rates for all legal services involving litigation and only a very select few types of tasks and matters include a flat fee (which are never litigation-type cases).

16. When the Firm is engaged to work on a matter, the retainer is reduced on a monthly basis and covers fees incurred for professional services rendered through the month of billing.

17. When a retainer is exhausted, if the representation is continuing the client would be issued an invoice and the credit card will be charged or the Firm will request replenishment of the retainer.

18. Regardless of the amount to be charged or expected for services, for all litigation matters, credit card numbers are required by the Firm for all clients.

19. The Firm obtains credit card information and authorization for charges through the retainer form provided and executed by clients, which is filled out and signed by the client, providing all information necessary for the Firm to charge the credit card once the retainer is exhausted for fees then due on a monthly basis.

20. Paul contacted the Firm in late October 2015, seeking legal representation on what was stated by him to be an emergency basis for a pending legal matter in which he was a party.

21. Specifically Paul was engaged in litigation and he sought a "ghost writer" for his Chicago-based attorney Margaret Lundahl (with her agreement because they both agreed that Margaret needed some help in facing Lloyd).

22. At the time of the retention of the Firm, Paul was defending against a motion for summary judgment and he was unhappy with the quality of Lundahl's work, as was suggested to him by his friend a "California lawyer named Dan" (who is not licensed to and does not practice law in Illinois).

23. Dan told Paul that the papers drafted by Margaret were substandard and he would never prevail on the Motion, and so Paul felt the need to get someone to research and write for her.

24. On or about October 26, 2015, Paul called and emailed the Firm and sought out legal services for writing, and he specifically indicated initially that the necessary work was assistance with one motion which would be drafted by Levin but submitted and filed in the case under Lundahl's name and with her consent.

25. After speaking with Paul, Levin quoted an hourly rate of $315.00, to which Paul agreed and he commented that "the rate was better than Chuhak & Tecson's rate" and that he had "previously hired some of the largest law firms in Chicago."

26. On October 28, 2015 Levin quoted Paul an initial retainer of $4,000 and emailed him the retainer agreement and the two discussed setting up an in person meeting whereby Ms. Lundahl and Levin would meet in Chicago to discuss the file and a necessary strategy (since Paul was calling Levin from California and needed work performed remotely).

27. Paul agreed with Levin that the initial retainer of $4000 would be paid, and that in consideration of her agreement to immediately schedule a meeting with Lundahl and begin work before month's end, Levin scheduled the meeting with Lundahl.

28. At the time Levin agreed to begin work, Paul promised to immediately mail the initial retainer check and to fax the executed Retainer Agreement, which he did.

29. Thereafter, Paul mailed a check to the Firm for the $4000 initial retainer that was received by Levin and deposited into the Firm's IOLTA trust account.

30. As part of the Firm's typical due diligence when beginning work on a matter already in litigation and after being hired, Levin began to research Paul's case online and through those efforts she obtained information about the prior cases Paul had involvement in from public records (which included multiple claims filed by Paul against his prior lawyers).

31. Several of the matters located online related to Paul's family matters, and other lawsuits related to complaints about his lawyers.

32. A few days after the Firm was hired, Levin met in person with Attorney Lundahl at Paul's insistence, and in that meeting reviewed many pleadings and records during the multi-hour meeting.

33. In the days after being hired (and in order to preserve various deadlines that had been set in the court case by the judge), Levin performed extensive legal research, and responded to many emails and phone calls and met with Lundahl, spending 6.3 hours on Paul's matter in October.

34. The invoice for services detailed 6.3 hours at the rate of $315 an hour, which totaled $1984.50.

35. This invoice was emailed to Paul showing the trustfunds that had been used, and Paul did not comment after receipt of the October Invoice.

36. As of November 1, 2015, Paul knew that at that time that only $2015 remained of the initial retainer, and that none of the main work on the initial motion had been completed yet (as Levin was waiting for some files from Lundahl that still needed review, in addition to additional

5

research and to formulate a specific plan with Paul which had not yet been done), all of which Paul was told about.

37. In the first or second week of November 2015, the scope of the request for legal services to the Firm by Abramson were extended beyond the initial request, and Paul asked Levin and the Firm to include additional motions and work in relation to a subpoena to a judge who presided over a related case, for a total of three motions (including two motions for summary judgment).

38. The entire attorney-client relationship lasted approximately six weeks.

39. Over the course of those six weeks, the Firm provided legal services to Paul that consisted of advice and counsel, writing services, research, assistance to Margaret Lundahl, and time spent in communications with both Lundahl and Paul (which such time communicating with Paul was extensive, lengthy and often multiple times per day both via email and telephone).

40. When completed, the motions and affidavits were provided to Lundahl and Paul for review, and were filed by Lundahl with Paul's approval.

41. Nothing was filed that Paul did not see in advance and specifically approve of.

42. Paul was very happy with all of the work performed at the time it was completed, and Paul advised Levin that his "trusted counsel Dan" had reviewed all of the work and that he approved of it.

43. The Firm, in performing the agreed upon legal services that Paul's matter necessitated, charged Paul for 37.5 hours of time for services rendered in the month of November, 2015.

44. Once utilizing the remaining retainer funds left over from October 2015, after the remainder of the retainer was used, Paul owed $9,167.00 to the Firm for services rendered. Paul's card was charged for the work pursuant to the retainer agreement.

45.	After receipt of the second invoice from the Firm in the beginning of December 2015, Paul fired the Firm, and all work stopped.

46.	In response to being discharged, since the Firm and Levin were not counsel of record in the pending case in court and only Lundahl had an appearance on file, the Firm closed its file.

47.	In December 2015, within a few weeks of the termination of services, Paul commenced a campaign against the Levin and the Firm wherein he has claimed erroneously that the firm's charges were fraudulent, including complaints to the Bar Association, the ARDC, on-line and to others.

48.	After the Chicago Bar Association Complaint was advanced in December 2015, Paul began calling Levin and hanging up on her, leaving foul and obscene and upsetting voice-mail messages and telling others, including Lundahl that he had been "defrauded."

49.	Although not required to do so, the Firm responded in writing to the bar association inquiry letter, and shortly thereafter the Chicago Bar Association declined to take action against Levin or the Firm and it closed its file.

50.	Thereafter, Paul contacted the Illinois Attorney Registration and Disciplinary Commission ("ARDC"), wherein the same complaint that had been sent to the CBA was submitted and Paul began to call the investigator Chi "Michael" Zhang weekly to disparage Levin.

51.	Levin on behalf of herself and the Firm, and in response to the ARDC matters, prepared multiple written responses to the ARDC.

52.	In the spring of 2016 Paul disputed the credit card charge with his bank by complaining that the Firm's charge was fraudulent.

53. In response, the Firm's credit card issuer debited the disputed funds in the amount of $9167.00 from the Firm's account, and for the duration of the dispute Paul's credit card was credited with the disputed funds.

54. During the entire winter and spring of 2016, the parties were engaged in a credit card dispute process, which was ultimately resolved in the Firm's favor.

55. In the summer of 2016, after Paul refused to pay her for services rendered, Margaret Lundahl filed for and was granted an order allowing her withdrawal from Paul's case.

56. In October, 2016, the ARDC investigation that Paul had instituted against Levin still ongoing, counsel for the ARDC contacted Plaintiff Levin and advised her that because Paul had been calling him every week and sometimes multiple times per week, he required that Levin sit for a deposition before the ARDC.

57. Levin acquiesced and hired counsel to appear and provided the requested testimony in relation to Paul.

58. In November 2016 the ARDC concluded its investigation with no action taken against Levin or the Firm, and the ARDC file was closed.

59. In the spring of 2017, after Paul learned of the ARDC decision, Paul began "billing" the Firm for $4000 and sending invoices periodically through PayPal, although the Firm ignored them.

60. When Paul's invoices were ignored (since they were "made up") Paul began to engage collection agencies to harass Levin, one of which was called Receivable Management Services.

61. The collection agencies use "robo-calling" techniques to call the Firm's business phone number frequently.

62. On March 22, 2017, Paul posted online a false and malicious review on the Yelp website under the Firm's account page. A true and correct copy of the review is attached hereto and incorporated herein as **Exhibit A**.

63. In the March 22, 2017 review, Paul, using the Yelp Account name "Van Richter" (which is Paul's company), wrote the following:

> **"Craig's list legal predator - not your legal advocate**
>
> **Alissa Levin represents herself as a legal ghost writer expert on Craig's list.. That should have been my first red flag. She is nothing more than a con artist who prays on people in legal trouble like yours truly. She was supposed to draft and file my motion for summary judgement as well as final reply brief for a budget of $4000. Instead she blew through the budget then quit when I refused to pay her supplemental bill of $9167 which she illegally charged to my credit card that later was recovered by my credit card company due to a fraudulent transaction. Her pleadings were also stricken by the court which made them worthless and she was not even aware of how to draft an affidavit that does not require a notarized signature. The ARDC later advised me never to hire an attorney off Craig's list and now I know why as those prowling it like Ms. Levin are only looking to take advantage of those already victimized by the legal system. You have been warned"**

64. The review characterized Levin's conduct as fraudulent and illegal, and disparaged Levin and the Firm and accused them of illegal conduct.

65. Paul's Yelp review suggested that Levin did not know how to prepare certain legal papers which imputes the inability to practice law, which such statements were untrue.

66. Levin posted an online response in defense that Paul was a disgruntled former client whose ARDC complaints had been closed without action taken.

67. Paul again complained to the ARDC who triggered another investigation, this time accusing Levin and the Firm of posting prohibited material about the representation on the Internet.

68. The Firm hired counsel to represent it again before the ARDC and after the second lengthy investigation the matter was closed without any action taken against Levin or the Firm (although the Firm had to pay legal fees for the matter in conjunction with the representation.)

69. In July 2017, Paul made changes to his defamatory and inaccurate Yelp review and republished it, which drove the review to the top of the list of other reviews on Yelp, so that every person accessing the Firm's Yelp page would see both reviews (his original one and the updated version).

70. The July 2017 defamatory review written and posted by Paul was as follows:

> **7/27/2017**
> **"Alissa Levin represents herself as a legal ghost writer expert on Craig's list.. That should have been my first red flag. She is nothing more than a con artist who prays on people in legal trouble like yours truly. She was supposed to draft and file my motion for summary judgement as well as final reply brief for a budget of $4000. Instead she blew through the budget then quit when I refused to pay her supplemental bill of $9167 which she illegally charged to my credit card that later was recovered by my credit card company due to a fraudulent transaction. Her pleadings were also stricken by the court which made them worthless and she was not even aware of how to draft an affidavit that does not require a notarized signature. The ARDC later advised me never to hire an attorney off Craig's list and now I know why as those prowling it like Ms. Levin are only looking to take advantage of those already victimized by the legal system. You have been warned."**

71. In addition to the online posting, Paul continued to invoice the Firm, and commencing in July 2017 to the present, Paul has sent the Firm an invoice periodically demanding payment of $4000.

10

72. Because the Firm and Levin have ignored Paul's "invoicing" (since there is no oral or written agreement whereby the Firm has agreed to refund or pay Paul any amount since all fees charged were earned, and there was no remaining trust account balance available), the invoice emails have gone unanswered.

73. On November 14, 2017 Paul caused a complaint to be published against the Firm through the Better Business Bureau (BBB) and Paul emailed Levin to advise her of the same, although Levin did not respond to Paul or receive a copy of any complaint. A true and correct copy of the email communication from Paul to Levin that date is attached hereto and incorporated herein as **Exhibit B**.

## COUNT I: DEFAMATION PER SE

74. Plaintiffs repeat and re-allege Paragraphs 1-73 of the general allegations as and for its Paragraph 74 of this Count I, as if fully stated herein.

75. Paul's online statements about Levin and the Firm were mere his opinion, however due to the nature of the statements and the content and context, they appear to anyone who reads them to be factual, which has implied undisclosed defamatory facts.

76. The Yelp Review and its later update, constituted an untrue and verifiable statement by Paul that the public can and would ascribe truthful statements to.

77. The literary context of the Yelp Review drafted and published by Paul would and did influence average readers of the Yelp Review of the Firm so that said readers would and did infer that Paul's statements had factual content and thereby skip contacting the Firm or finding that Levin was a good or competent lawyer.

78. Because Yelp is an online review portal, the social context and setting in which Paul's defamatory Yelp review was written and posted on the Internet signals a usage as fact, rather

11

than merely Paul's opinion (since the average reader deciphers opinions as being based upon facts, especially when it comes to certain and many professionals).

79. Paul was not privileged to disclose matters pertaining to the Firm's representation to third parties online, and his publication contained untrue assertions of fact.

80. The untrue assertions of fact in the Yelp reviews impugned Levin and the Firm's reputation and accused Levin of illegal and unethical conduct, which was untrue.

81. Paul published the damaging and defamatory statements in the review on the internet and to the Better Business Bureau with the knowledge that the submission and statements were false.

82. By posting online that he had reported Levin to the ARDC (which is a confidential proceeding) the suggestion was made to online viewers of Levin's Yelp profile or the Firm's website that Levin could not be trusted with honoring ethical responsibilities to clients and that Levin had violated the law.

83. Paul published the Yelp review and has made improper publications about Levin and the Firm despite Levin having done nothing in derogation of the parties' written contract calling for the Firm to bill Paul by credit card for work he asked the Firm to do.

84. Levin is a private person and Paul knows or should know that Levin depends on the Firm's online rating and reviews to obtain clients and to maintain a successful practice in order to earn a living.

85. Paul's publication of the Yelp review has damaged the Plaintiffs insofar as Levin has suffered from a substantial decrease in inquiries and business as the result of Paul's defamatory posting.

86. Paul's Yelp posting imputes the commission of crimes and Levin's inability to perform and a lack of integrity in the practice of law as well as a lack of ability in Levin's trade (i.e. the practice of law) in that it accused Levin of fraudulent conduct.

87. Paul has no privilege to make the defamatory comments against either Levin or the Firm.

88. Paul's statements and online reviews and harassing behavior are not subject to any kind of innocent construction as accusing an attorney of committing fraud and lying is not susceptible to more than one meaning except to make it clear that Levin is unethical and untrustworthy.

89. Paul's conduct is and has been malicious and was for the express intent to harass and intimidate Levin.

90. Paul's maliciousness is demonstrated by his actions and he submitted an "unpaid invoice claim" to a collection agency who calls Levin weekly (despite there being no contract for which Levin was to pay her former client and the lack of any money owing to Paul), and Paul continues to send invoices to Levin via Paypal. A true and correct copy of one such invoice from Paul to the Firm is attached hereto and incorporated herein as **Exhibit C**.

91. Paul (through his online posting to Yelp and statements has falsely accused Levin of perpetrating or committing a crime through the representation.

92. Paul has asserted false allegations and claims that purport to be factual – even though they are not true - and the average person seeing Paul's online content could easily believe such statements had a factual basis, or were true.

93. The statements have damaged Levin and the Firm as a solo legal practitioner (whose reputation is necessary to generate business) the vast majority of which comes from online inquiries.

94. Paul's use of words like "false", "fraud", "illegal" impute the commission of crimes by Levin and the Firm, as well as a want of integrity in discharging the duties of employment as an attorney, have prejudiced and damaged Levin and the Firm in the practice of law as a solo legal practitioner.

95. Paul published these statements to third parties through the following affirmative acts:
    a. Letter to the Chicago Bar Association – December 2015
    b. 1st Complaint to the ARDC – Spring 2016
    c. Complaint to the credit card company – Spring 2016
    d. Statements made to ARDC Investigator Chi "Michael" Zhang about Levin which were relayed to Levin by Zhang
    e. Online posting to Yelp.com and Avvo.com and Google.com of reviews about Levin
    f. 2nd ARDC Complaint – Spring 2017
    g. Complaint to Collection agency about Levin owing Paul money – Spring 2017
    h. Update of Yelp Review – July 2017 – changing the language
    i. Better Business Bureau Complaint – November 2017

96. Paul's online statements are retrievable through a simple internet search of Levin's name.

97. Levin has been damaged by Paul's conduct in that she has lost time and money in defending herself to the ARDC, Chicago Bar Association, Collection Agencies (who call Levin at least weekly), Legal fees in hiring counsel for the Firm to be represented time in dealing with the credit card dispute, among others, and including substantial lost revenue as the result of Paul's defamatory posting.

**WHEREFORE** the Plaintiffs Levin Law Ltd and Alisa Levin respectfully request this Honorable Court to find in their favor and against Paul Abramson and to provide the following relief:

1. Permanently enjoin Paul from speaking or writing about Levin and the Firm in any way, shape or form;

2. Enter an order authorizing damages in favor of the Plaintiffs in the amount of $100,000 compensatory damages;

3. Award punitive damages in the amount of $1,000,000;

4. Award legal fees in such amounts as are authorized; and

5. In addition to any other relief this Court deems just and proper.

### COUNT II: FALSE LIGHT INVASION OF PRIVACY

98. Plaintiffs repeat and re-allege Paragraphs 1-97 of the general allegations and Count I as and for its Paragraph 98 of this Count II, as if fully stated herein.

99. Due to the affirmative acts of Paul, Levin and the Firm were placed in a false light before the public as the result of Paul's portrayals and statements.

100. The false light which Levin and the Firm were placed in would be highly offensive to a reasonable person – especially a reasonable person who only wanted to help a client like Paul and do the best job they could for that client.

101. Paul did previously, and continues to, act with actual malice and total disregard for the time expenditure in dealing with him (which was the initial cause of his fees to be so high in that he never left the Firm alone to just do its job and called incessantly for hours on end), and Paul's acts demonstrate an intentional disregard for Levin's rights, and malice toward her and in her profession and her ability to make a living.

102. Paul has knowledge that his statements are false and figments of his imagination, and that his claim of the Firm owing him money or doing anything illegal is completely false.

103. Paul knows and did in fact agree in writing to be charged on his credit card and his statements to the contrary are complete fabrications.

15

104. Paul knows and did then know that he clearly agreed to be charged on an hourly basis at the rate of $315.00 per hour for the Firm's work.

105. Paul knows and did then know (both due to the fact that Levin told him and because he is acutely familiar with how lawyers charge hourly since he is so litigious and engaged in so many lawsuits), that the initial retainer was not a flat fee for all work to be done.

106. Paul knows and did then know that Levin performed many hours of work that Paul approved of and found satisfactory before the documents were provided to Paul, as well as to attorney Margaret Lundahl for filing.

107. Paul knows how many hours he spent on the phone and how many emails were exchanged in a six-week period of time because both he and Levin have records that support such time expenditures.

108. Paul knows and did then know that the ARDC of the State of Illinois did conclude multiple investigations over the claims made by Paul in regards to the credit card charges and there was no affirmative action taken by the ARDC against Levin or the Firm and no decision of any illegal conduct by Levin or the Firm – which makes Paul's online statements ones that are unequivocally false.

109. Levin and the Firm have a right to have their reputations be protected and let alone from false publicity.

110. Levin and the Firm have been damaged insofar as there has been a sharp and distinct decrease in business since the false publication was made in the form of lost revenue, as well as a significant loss to Levin and the Firm in hiring counsel and billable time lost in dealing with Paul's campaign of hate.

**WHEREFORE** the Plaintiffs Levin Law Ltd and Alisa Levin respectfully request this Honorable Court to find in their favor and against Paul Abramson and to provide the following relief:

1. Permanently Enjoin Paul from speaking or writing about Levin and the Firm in any way, shape or form to anyone;

2. Order Paul to remove any and all online reviews of Levin and The Firm, including specifically any Yelp Reviews, BBB, Avvo or Google+ reviews, or any other online manner of comment or statement about Levin or The Firm;

3. Enter an order authorizing damages in favor of the Plaintiffs in the amount of $100,000;

4. Award punitive damages in the amount of $1,000,000;

5. Award legal fees in such amounts as are authorized; and

6. In addition to any other relief this Court deems just and proper.

                Respectfully submitted,

                LEVIN LAW LTD. AND ALISA LEVIN, *Plaintiffs*

By:   /s/ *Alisa M Levin*
        _____

Alisa M. Levin, Esq.
Levin Law Ltd.
2210 W. Chicago Avenue
Chicago IL 60622
T: 312-720-0082

17